**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| SHANNON VOLLING, JULIE BANSER, and APRIL SOULAK | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 11 C 04920 |
| v. | ) | |
| | ) | Judge John J. Tharp, Jr. |
| ANTIOCH RESCUE SQUAD, individually and jointly as a joint employer with Metro Paramedic Services, Inc., and METRO PARAMEDIC SERVICES, INC., individually as an agent of Antioch Rescue Squad and joint employer with Antioch Rescue Squad, | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

The defendants, Antioch Rescue Squad ("ARS") and Metro Paramedic Services, Inc., move to dismiss the 22-count Second Amended Complaint against them. ARS alternately seeks summary judgment, insofar as its arguments rely on material outside the complaint. For the reasons that follow, the motions are granted in part and denied in part.

Sharon Volling, Julie Banser, and April Soulak are current and former members of the Antioch Rescue Squad, a private, non-profit provider of emergency medical and ambulance services in the Village of Antioch, Illinois. The squad is jointly operated and staffed by the two defendants. The plaintiffs' complaint alleges, in disturbing factual detail, that they were subjected to sexual harassment (including offensive, even potentially criminal, physical contact), a hostile work environment, sex discrimination, and retaliation at the hands of co-workers and supervisors. The federal claims are brought pursuant to 42 U.S.C. § 1983 (Counts I, II, VII, VIII, XIII, IV), and Title VII of the Civil Rights Act (Counts III, IV, IX, X, XV, VI). The plaintiffs also bring similar claims under the Illinois Human Rights Act (Counts V, VI, XI, XII, XVII,

XVIII). Finally, the plaintiffs allege tort liability under Illinois common law for negligent retention (Counts XIX, XX) and negligent supervision (Counts XXI, XXII).

The defendants have moved to dismiss the Second Amended Complaint in its entirety. Their primary arguments are that they are not subject to claims under § 1983 because they are not state actors and that Title VII and the IHRA do not apply to them because they are not employers within the meaning of those statutes. With respect to the state-law tort claims, the defendants primarily argue preemption, and they also urge the Court to decline supplemental jurisdiction. The plaintiffs oppose the motions, arguing that their detailed complaint more than adequately sets forth sufficient facts to support their claims for relief, and that the defendants are raising substantive arguments not appropriate for resolution on the pleadings.

In addition to seeking dismissal, ARS also moved for summary judgment because it submitted evidence outside the pleadings: the affidavit of ARS Deputy Chief Brian DeKind. The affidavit attests to facts relevant to whether ARS is a state actor and whether it is an employer of the plaintiffs. Metro also supported its motion with an affidavit, but did not ask for the Court to treat its motion as one for summary judgment. During the briefing of the motions, the plaintiffs moved to strike both affidavits. The predecessor judge granted that motion (Dkt. # 48), and the defendants have not asked this Court to reconsider. Therefore, the affidavits will not be considered in support of either motion, and there is no need to treat ARS's motion as anything but a motion to dismiss. The scope of ARS's motion was further narrowed on October 23, 2012, when this Court entered judgment for plaintiffs Volling and Soulak against ARS pursuant to an offer of judgment. To the extent that ARS's pending motion targets these two plaintiffs, it is denied as moot. ARS's motion will be addressed only as it relates to plaintiff Banser.

A motion under Rule 12(b)(6) challenges a complaint's sufficiency to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). In considering the defendants' Rule 12(b)(6) motions, the Court accepts as true all of the factual allegations in the complaint and draws all reasonable inferences in favor of the plaintiffs. *Erickson v. Pardus*, 551 U.S. 89 (2007); *McGowan v. Hulick*, 612 F.3d 636, 637 (7th Cir.2010). However, the Court does not accept as true allegations that are mere legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 679-80 (2009).

A federal complaint should be "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). But however short and plain, it must contain sufficient detail to "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. v. Twombly*, 550 U.S. 544, 545 (2007). And it must have "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). The "required level of factual specificity rises with the complexity of the claim." *McCauley v. City of Chicago*, 671 F.3d 611, 616–17 (7th Cir. 2011) All told, the factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## A. Defendants as state actors

Metro and ARS each argue that all federal constitutional claims against them must be dismissed because they are not state actors and could not have taken any action "under color of state law." *See* 42 U.S.C. § 1983.

The same standard applies for determining whether a private party is a "state actor" for purposes of the Fourteenth Amendment, and whether that party acted "under color of state law" for purposes of §1983. *Lugar v. Edmondson Oil Co., Inc*., 457 U.S. 922, 929 (1982) (explaining

that "it is clear that in a § 1983 action brought against a state official, the statutory requirement of action 'under color of state law' and the 'state action' requirement of the Fourteenth Amendment are identical"). That standard, however, is not a bright line that is easily applied and, as the plaintiffs observe, it often requires a fact-intensive inquiry. But not always. There have been many cases in which courts appropriately concluded, on motions, that there was no state action as a matter of law. *See, e.g., London v. RBS Citizens, N.A.*, 600 F.3d 742 (7th Cir. 2010); *Hallinan*, 570 F.3d at 821; *Gayman v. Principal Fin. Servs., Inc.*, 311 F.3d 851, 853 (7th Cir. 2002); *Fries v. Helsper*, 146 F.3d 452 (7th Cir. 1998). The plaintiffs are wrong, therefore, to argue that it is necessarily "inappropriate" to dismiss a complaint on this basis. The question is not whether the inquiry is fact intensive; it is whether the plaintiffs allege sufficient facts to make state action plausible.

It bears noting at the outset that this is not a case in which it is alleged that the state has effectively directed, controlled, or encouraged the actions of a private party. *See* Pl. Memorandum, Dkt. # 41 at 12-13 n.8 (acknowledging absence of allegations "that the state was involved in, coerced, or encouraged the constitutional tort"). In those cases, "a State normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Wade v. Byles,* 83 F.3d 902, 905 (7th Cir. 1996). Rather, here the defendants, though not officially denominated as such, are alleged to be *de facto* state actors. The question presented by the complaint, then, is "whether the allegedly unconstitutional conduct is fairly attributable to the State." *Am. Mfrs. Mutual Ins. Co. v. Sullivan,* 526 U.S. 40, 50 (1999). In such a case, "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that

of the State itself.'" *Brentwood Academy v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co*., 419 U.S. 345, 351 (1974)). "[N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id*. In short, "the criteria lack rigid simplicity." *Id*.

There are several ways that plaintiffs may prove that challenged conduct by putatively private defendants should be deemed to be conduct by the state, including theories that the plaintiffs refer to as the "public function test," the "joint action" or "government nexus" test, the "symbiotic relationship test," and the "totality of the circumstances/entwinement/delegation" tests. Memorandum, Dkt # 41 at 9-14; *see generally Brentwood Academy,* 531 U.S. at 291-92; *Rodriguez v. Plymouth Ambulance Serv.* 577 F.3d 816, 823-24 & nn.8-11 (7th Cir. 2009); *Air Line Pilots Ass'n, Int'l. v. Dep't of Aviation of City of Chicago*, 45 F.3d 1144, 1149 (7th Cir. 1995). The plaintiffs argue that their factual allegations set the table for them to establish (at the appropriate time) that ambulance and paramedic services are a traditional public function that has been delegated to the defendants; that the contract between ARS and the Village evinces their joint action to provide services; and that the mutuality of support and benefits under the arrangement shows a symbiotic relationship, or one of "pervasive entwinement" between the defendants. The complaint, however, fails to plausibly allege any facts suggesting the plaintiffs could satisfy the requirements of any of these tests.

### 1. The Public Function Test

"That a private entity performs a function which serves the public does not make its acts [governmental] action." *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982). Under the "public function" theory, the private entity is deemed to be a state actor when it performs a role or

function that has been "traditionally the *exclusive prerogative*" of the government. *Id.*; *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974) (emphasis added). This is a very narrow category of functions. *See Vickery v. Jones*, 100 F.3d 1334, 1345 (7th Cir. 1996) (collecting cases). And here, the plaintiffs do not plausibly allege facts that could support a conclusion the provision of emergency medical and ambulance services has been traditionally an exclusively public function. There is no allegation that any unit of government ever provided ambulance services in Antioch; and even if one had, the government's later decision to delegate services to private entities does not in itself make the private entities state actors. *See Spencer v. Lee*, 864 F.2d 1376, 1379 (7th Cir. 1989) ("The scope of government is not fixed; deregulation does not create a host of state actors in the private sector, like the moraine that marks the farthest advance of a glacier."). Moreover, the Village of Antioch does not have a constitutional obligation to provide ambulance services. *See Wade v. Byles*, 83 F.3d 902, 906-907 (7th Cir. 1996) (explaining that private actor acts as arm of state when performing function that state is constitutionally obligated to provide). And state statutes plainly allow for the operation of private ambulance and medical services in Illinois. For example, the Municipal Code empowers local governments to operate ambulances *or* to contract for those services. *See* 65 ILCS 5/11-5-7.[1] Also telling is that Illinois law distinguishes between private and public ambulance services in the application of its statutory

---

[1] The plaintiffs contend, citing 55 ILCS 5/5-1053(a)(1), that "the Illinois legislature has *mandated* that 'adequate and continuing emergency ambulance service should be available to citizens of Illinois,'" Dkt. # 41 at 11, but that statute says nothing of whether that function is traditionally the exclusive province of government. That provision of the County Code announces the sound public policy that emergency ambulance services "should be available" to all citizens, but it specifically contemplates that the services may be furnished by private companies, *see id.* at § 5-1053(a)(2), and, rather than "mandating" anything, provides that counties "should" be authorized to provide or cause to be provided ambulances as a public service, *see id.* at § 5-1053(a)(3). By contrast, a prior version of the same law mandated that counties "*shall*" provide or cause to be provided the ambulance services. *See* 1979 Ill. Atty. Gen. Op. 18, 1979 WL 21176.

tort immunity. *See Buell v. Oakland Fire Protection Dist. Bd*., 605 N.E.2d 618, 622 (Ill. App. Ct. 1992). Although all ambulance services, public and private, are regulated by the state, even "extensive and detailed" regulation of an industry does not make that industry public. *Sullivan*, 526 U.S. at 52 and 57 (quoting *Jackson*, 419 U.S. at 350); *Gayman*, 311 F.3d 851, 853 (7th Cir. 2002). Nor does setting standards, *Sullivan*, 526 U.S. at 54—and Illinois' Emergency Medical Systems Act by its terms was simply "intended to provide minimum standards for the statewide delivery of EMS services." 210 ILCS 50/2. It cannot be said that ambulance services are traditionally the *exclusive* province of the government; if anything, the plaintiff's allegations suggest that, in Antioch, ambulance services are and always have been exclusively private.[2]

### 2. *Joint Action/Government Nexus Test*

The plaintiffs also argue that the existence of a contract between ARS and the Village of Antioch "will serve to establish state action under the joint action test or government nexus tests." Pl. Memorandum, Dkt. #41, at 11-12. As stated, that proposition is plainly too broad; if it were true, all government contractors would be state actors and all of their conduct state action—and that is not the case. "Acts of . . . private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." *Rendell-Baker*, 457 U.S. at 841; *see, e.g., Wade*, 83 F.3d at 906 (contract CHA security guards not state actors); *Bowman v. Franklin*, 980 F.2d 1104, 1108 (7th Cir. 1992) (consulting engineer on public works project not a state actor).

---

[2] The plaintiffs' reliance on *West v. Adkins*, 487 U.S. 42 (1988) and *Rodriguez*, 577 F.3d at 830, is misplaced. Both of those cases assessed whether ambulance companies were performing a public function in the context of providing emergency medical services for prison inmates. That the government is responsible for providing such services to persons involuntarily incarcerated in state facilities says nothing about whether it has traditionally and exclusively been required to provide such services to the general public.

*Lopez v. Department of Health Services.,* 939 F.2d 881 (9th Cir. 1991), the sole case on which the plaintiffs rely for this startlingly broad proposition, highlights the principal flaw in the plaintiffs' application of this test—namely, that the allegedly unconstitutional conduct has nothing to do with the government contract. In *Lopez,* the Ninth Circuit reversed a district court's *sua sponte* dismissal of an indigent plaintiff's complaint that the defendant hospital and ambulance service, under contract with the state to provide medical services to indigents, refused to do so. Whatever the merits of that holding (and the court did not offer any explanation of why the contract sufficed to establish a relationship by which where the defendants should be deemed to be state actors and did not cite *Rendell-Baker*), it has no relevance here, where the allegedly unconstitutional conduct was not a failure to provide the services covered by the public contract, but private conduct as far removed from the contractual services as can be imagined.

The Supreme Court has been clear that the test of "state action" is not to occur in the abstract, but with reference to "'the specific conduct of which the plaintiff complains.'" *Sullivan*, 526 U.S. at 51 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). Contractual relationship with the government or no, a complaint of "merely private conduct," *London v. RBS Citizens, N.A.*, 600 F.3d 742, 746 (7th Cir. 2010), does not suffice to state a claim under § 1983. The deprivation itself must have occurred "under color of state law," meaning that the "alleged constitutional deprivation [was] 'caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible.'" *Sullivan*, 526 U.S. at 50 (quoting *Lugar*, 457 U.S. at 937). Here, there are no allegations in the complaint that make it plausible that the alleged constitutional deprivation—the sexual harassment—has anything at all to do with the defendants' contract with the Village, and

there is accordingly no basis on which to say that the conduct "is fairly attributable to the state" by virtue of that contract.

### 3. Symbiotic Relationship Test

The same fundamental flaw afflicts the plaintiffs' attempts to invoke a laundry list of other labels courts have used in evaluating whether allegedly unconstitutional conduct is fairly attributable to the state. Whether there is a "symbiotic" or other close relationship between the defendants and the relevant governmental unit is not, standing alone, a sufficient basis to support a finding of state action; there must be "such a close nexus between the state *and the challenged action* that seemingly private behavior reasonably may be treated as that of the state itself." *Hallinan*, 570 F.3d at 815-816 (emphasis added). But here, the detailed factual allegations of the complaint describe private conduct—despicable and reprehensible, to be sure—that bears no relationship to the nature of the "nexus" between the defendants and the Village of Antioch.

The plaintiffs claim a "symbiotic relationship" exists between the defendants and the Village based on the defendants' provision of ambulance and rescue services in exchange for an essentially cost-free lease, fuel supplies and dispatch services. This argument is essentially no different than the plaintiffs' "joint action" theory premised on a contract between the defendants and the Village, and does nothing to narrow the absence of any logical connection between the exchange of these services and responsibility for the lewd and offensive behavior alleged in the complaint. The "symbiotic relationship" test derives from *Burton v. Wilmington Parking Authority,* 365 U.S. 715 (1961),[3] where a public agency leased space in a parking garage to a private restaurant that refused to serve African-Americans. Detailing the mutually beneficial

---

[3] The term was not used in the *Burton* opinion, but first surfaced (in the Court's opinions, anyway) in *Polk County v. Dodson,* 454 U.S. 312, 322 n.12 (1981), where the Court characterized it as a species of "joint participation" theory and rejected its application in the context of evaluating a claim that public defenders act under color of state law.

relationship between the parking garage and the restaurant—easy parking for the restaurant's patrons and greater demand for the garage's spaces—the Supreme Court held that the restaurant's discrimination constituted state action. But nothing in the opinion stands for the proposition that the existence of a mutually beneficial relationship, standing alone, warrants the characterization of all private conduct by a state contractor as state action; indeed, the Supreme Court has since taken numerous opportunities to clarify that "privately owned enterprises providing services that the State would not necessarily provide, even though they are extensively regulated, do not fall with the ambit of *Burton.*" *Sullivan,* 526 U.S. at 57 (quoting *Blum,* 457 U.S. at 1011). The defendants—private enterprises providing regulated services that the State is not required to provide—do not fall within *Burton's* ambit.

### 4. Totality of Circumstances/Entwinement/Delegation Tests

And finally, the plaintiffs rely on two additional cases to argue that delegation of governmental functions to a private entity cannot shield that entity from constitutional torts. This sounds little different than the "public function" test, discussed above; the argument goes wrong, as noted above, because the state has not "delegated government functions" to the defendants. The plaintiffs' reliance on *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 345 (4th Cir. 2000) is therefore unavailing; in that case the Fourth Circuit expressly held that firefighting "has traditionally been the exclusive function of the state [Maryland]"—in other words, that the defendant was performing a public function.

The Supreme Court's opinion in *Brentwood Academy* provides no more support to the plaintiffs. There, while observing that "no one fact can function as a necessary condition across the board for finding state action," 531 U.S. at 295, the Court held that the high degree of "entwinement" between public school officials and a not-for-profit interscholastic association—

84 percent of the association's members were public schools—rendered the association largely indistinguishable from the public schools and therefore the association's enforcement of an allegedly unconstitutional rule constituted state action under § 1983. *Brentwood Academy* represents an extreme version of joint participation between state and private actors, where unlike here the allegations could support a finding that the state effectively directed and controlled the actions of a private party. As noted at the outset of this discussion, there are no allegations of joint conduct between public and private actors in this case and, accordingly, the analysis of state action in *Brentwood Academy* has no application here.

Because, as a matter of law, the plaintiffs have not and cannot plausibly allege that the sexual harassment occurred under color of state law, the Court grants the defendants' motion to dismiss all of the § 1983 claims with prejudice. If the defendants are to bear responsibility for the alleged misconduct, they must do so not because they are state actors but because they are otherwise responsible for this private conduct.[4]

## B.      Plaintiffs as the defendants' "employees"

Both defendants seek dismissal of the Title VII and Illinois Human Rights Act claims on the basis that they were not the employers of the plaintiffs. Metro, conceding that it employed Volling, advances this argument only as to plaintiffs Banser and Soulak, and ARS's entire motion now applies only to plaintiff Banser. Any discussion of the "plaintiffs" in this section

---

[4] Having concluded that the complaint does not allege any state action, the Court need not address the defendants' claim that Title VII preempts the § 1983 claims or Metro's contention that it cannot be held vicariously liable under § 1983 for the actions of its employees under the doctrine of *respondeat superior,* other than to note that neither argument appears to be well-founded. The Seventh Circuit has said that is "well established" that "Title VII does not preempt § 1983 for public employers." *Wudtke v. Davel*, 128 F.3d 1057, 1063-64 (7th Cir. 1997) (citing cases). And the complaint includes plausible allegations that Metro has a policy, custom or pattern of official conduct that caused the alleged misconduct. Such allegations would suffice to state a claim under § 1983 *if* Metro could be deemed a state actor.

should be read in that light. Additionally, the Court has no way to separately analyze the two putative employers. Plaintiffs assert in their complaint and emphasize in their response to the motions to dismiss that ARS and Metro are "joint operators and joint employers." According to Plaintiffs, "Metro and ARS have a singular identity as well as an interrelation of operations, including shared premises, shared equipment and ambulances . . . and other resources" as well as "centralized control of labor and shared personnel." Metro concedes for purposes of its motion that it jointly operates the squad with ARS, and ARS does not address the issue at all. Therefore, the Court is given no basis on which to distinguish between ARS and Metro, and for purposes of the motions to dismiss, it accepts as true the Plaintiff's allegations of joint employment.

Title VII imposes liability only upon the complaining employee's "employer." 42 U.S.C. § 2000e–2(a). The statute's definitions of "employer" and "employee" are circular—an employee is someone employed by an employer—and refer neither to volunteers nor to payment or receipt of remuneration. *See id.* § 2000e(b) & (f). Absent statutory guidance, the Supreme Court has instructed courts to use the common law principles of agency in lieu of a substantive definition of "employee." *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323 (1992) (same definition under ERISA); *NLRB v. United Ins. Co. of Am.,* 390 U.S. 254, 260 (1968) (National Labor Relations Act); *see also Clackamas Gastroenterology Assocs. v. Wells,* 538 U.S. 440, 444-45 (2003) (reaffirming *Darden's* approach in context of Americans with Disabilities Act). Relevant factors in assessing whether a complainant is an "employee" of a respondent "employer" include "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying

assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party." *Community for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52 (1989). "No one of these factors is determinative." *Id*. at 752. The EEOC's Compliance Manual also sets forth a similar list of non-exhaustive factors to be considered in evaluating an employer-employee relationship. EEOC Compliance Manual, Section 2-III-A-1 ("Who is an 'employee'?").

Although no single factor is dispositive of one's status as an employee, the defendants would require an "employee" to be paid for her work. They insist that the plaintiffs, who are unpaid volunteers, cannot be deemed to be covered "employees."[5] That view is expressly contradicted by the Restatement, which recognizes that one may act as an agent gratuitously. *See Restatement (Third) of Agency § 1.01, cmt.d* (2006) ("Many agents act or promise to act gratuitously.); *id*. § 1.04(3) (defining "gratuitous agent" as one who "acts without a right to compensation"); *id*. § 7.07(3)(b) (noting that the fact that agent acts gratuitously does not relieve principal of responsibility for agent's acts). The Seventh Circuit has not weighed in on whether unpaid "volunteers" can be "employees" under Title VII, but it has squarely rejected the "tyranny of labels" advocated by the defendants in brandishing the term "volunteer" as a shield to ward off liability under Title VII. In *EEOC v. Sidley Austin Brown & Wood,* 315 F.3d 696, 705 (7th Cir. 2002), the Seventh Circuit followed and endorsed *Darden's* instruction to look to

---

[5] The "fact" that the plaintiffs are volunteers is not expressly included in the complaint, but the Plaintiffs do not dispute that, apart from Volling, who is a paid Metro employee, they are volunteers. *See* Resp. at 18-19 (arguing that receipt of benefits other than compensation supports finding that they are employees). Moreover, the Court may take judicial notice that the squad is primarily staffed by volunteers who are not paid. *See* Antioch Rescue Squad, http://www.antiochrescuesquad.com (last visited December 4, 2012); *Trust v. Crowley,* 2010 WL 748201, *3 n.1 (court may take judicial notice of publicly available information, including information on a party's web site). In any event, because the Court concludes that the plaintiffs are "employees" within the meaning of Title VII, reference to the ARS web site works no prejudice to the plaintiffs.

the myriad common law factors that are relevant to the question of whether one is an "employee" in determining whether individuals were covered "employees" under Title VII, rather than to the labels applied to them by the organization or even by state law. *See also Bryson v. Middlefield Volunteer Fire Dep't, Inc*. 656 F.3d 348, 354 (6th Cir. 2011) (reversing district court's holding that receipt of remuneration is a necessary antecedent to the inquiry into employment status under Title VII).

Rather than address the relevant common law factors as the Supreme Court and Seventh Circuit have directed, the defendants rely primarily on two district court cases, *Vickery v. Minooka Volunteer Fire Dep't.,* 990 F. Supp. 995 (N.D. Ill. 1997) and *Jones-Walsh v. Cicero,* 2005 WL 2293671 (N.D. Ill. 2005), holding that volunteers cannot be employees under Title VII.[6] *Vickery* was decided well before *Darden,* and in any event neither case discusses *Darden* or follows its direction to apply the common law of agency when assessing the existence of employment status under a federal law lacking a substantive definition of the term "employee."[7]

---

[6] ARS also relies on *Board of Education  v. Industrial Commission,* 53 Ill. 2d 167, 290 N.E.2d 247 (1972), but state law does not govern whether one is an employee under Title VII.  *Sidley Austin,* 315 F.3d at 704 ("The two classes, partners under state law and employers under federal antidiscrimination law, may not coincide."). In any event, the Illinois Supreme Court's decision in *Board of Education* involved the question of whether volunteers were eligible for worker's compensation benefits, which are substantially designed to compensate workers for lost wages— a remedy that plainly would not be available to unpaid volunteers whether or not they are considered to be "employees" for other purposes. In more general contexts, Illinois law recognizes that "there is no single fact that controls the existence or nonexistence of an employment relationship." *Village of Creve Coeur v. Indus. Comm'n,* 32 Ill. 2d 430, 432, 206 N.E.2d 706, 708 (1965).

[7] The defendants could have cited (but did not) several circuit court cases supporting their position. The Second Circuit and Fourth Circuits, in particular, have imposed a "significant remuneration" requirement for coverage under Title VII; although the employee's "remuneration" can comprise benefits other than salary, the benefits must be both "significant" and "economic." *See O'Connor v. Davis*, 126 F.3d 112, 116 (2d Cir. 1997) (requiring "direct or indirect *economic* remuneration); *Haavistola v. Community Fire Co*., 6 F.3d 211, 222 (4th Cir. 1993). Under this view, the "inconsequential incidents of an otherwise gratuitous relationship" do not amount to the "significant remuneration" that signifies an employer-employee

ARS (but not Metro) also argues that the Supreme Court's endorsement, in *Walters v. Metropolitan Educational Enterprises, Inc.,* 519 U.S. 202 (1997), of "the payroll method" of counting employees to meet Title VII's threshold jurisdictional requirement that an employer have at least 15 employees requires that an employee be compensated (*i.e.,* on the payroll) in order to have coverage under Title VII. That reads *Walters* far too broadly; the Court's opinion states expressly that "the ultimate touchstone" for the determination of the number of employees for jurisdictional purposes is "whether an employer had employment relationships" with the required number of workers, *not* whether they appear on the payroll. *Id.* at 211-12 (agreeing with petitioner's view that an individual who is on the payroll would not count if "not an 'employee' under traditional principles of agency law," and citing *Darden*). Indeed, the Court's holding rejected the view that the absence of compensation on any given day would require exclusion of a worker from the ranks of the organization's employees for purposes of Title VII, a position that is, if anything, inconsistent with the defendants' contention in this case that compensation is the *sine qua non* of Title VII coverage.

As the Sixth Circuit noted in *Bryson*, treating remuneration only as one of many factors bearing on the issue of status as an "employee" "comports with *Darden's* instruction that, when evaluating a particular relationship, 'all of the incidents of the relationship must be assessed and weighed with no one factor being decisive.'" *Id.* (quoting *Darden,* 503 U.S. at 324). Based on the Supreme Court's instructions, the Court agrees with the Sixth Circuit's view. The question and degree of remuneration are simply factors to be considered, along with many others, in assessing whether a worker is an "employee" for purposes of Title VII.

relationship for purposes of Title VII. *Haavistola*, 6 F.3d at 222. These cases, in the Court's view, cannot be reconciled with the Supreme Court's direction to look to the common law of agency and its teaching that no single factor is dispositive in the assessment of employment status.

The plaintiffs argue that they received some remuneration; the "complaint discusses training and uniforms being provided to Plaintiffs and it is reasonable to infer that, as EMT personnel of the squad, they received additional benefits as well." Memorandum, Dkt. # 41 at 19. These allegations are thin; the provision of uniforms and unspecified "training" are not the kinds of substantial pecuniary benefits that other courts or the EEOC have discussed when evaluating remuneration. And, an inference from plaintiffs' receipt of these perks that they also earned other, more concrete benefits is not necessarily a reasonable one; presumably if they received other forms of remuneration, they would have identified them in their complaint.

In the context of assessing the relationship of a worker to a not-for-profit organization, however, the question, nature, and degree of remuneration may be less relevant than they would be in assessing a similar relationship for a commercial enterprise. Non-paid "volunteers" may, for example, comprise a significant portion of the work force of a not-for-profit organization, motivated not by the prospect of pecuniary rewards but by a desire for public service, or by other altruistic, spiritual, or eleemosynary considerations. The conditions under which they perform their services, however, may differ in no other material way from the conditions under which compensated "employees" toil, and there seems little basis—and certainly none in the text of the statute—to conclude that Title VII's protections do not extend to them simply because there is a single factor—degree of pecuniary compensation—that distinguishes them from those the defendants would deem to be "employees." *Cf. Lomando v. United States,* 667 F.3d 363, 374 & n.9 (3d Cir. 2011) (volunteer physicians at non-profit health centers deemed to be government employees, citing 42 U.S.C. § 233(o)).

In all respects other than degree of pecuniary compensation, the members of the ambulance squad appear to be subject to the strictures of a typical workplace, and—

importantly—to the control exercised by an employer over paid employees. These plaintiffs have alleged that: "Plaintiffs are assigned to work specific shifts and Defendants control who works those shifts with them [Comp., ¶¶30, 63-67, 69]; that Plaintiffs performed their work in the station and ambulances operated and used by ARS and Metro [Comp., ¶¶12, 16, 19, 21, 36-37, 42]; that Plaintiffs are/were required to wear uniforms [Comp., ¶¶24-25]; that Plaintiffs received training through their work [Comp., ¶15]; that Plaintiffs were hired workers who had to go through probationary periods [Comp., ¶¶36(z), 37(k), 68]; and that Plaintiffs had supervisory-subordinate relationships with team leaders and Board members of ARS and with Metro supervisory personnel. [Comp., ¶¶31, 33, 51, 55, 58, 57, 62-68, 71]." Memorandum, Dkt # 41 at 17-18. These allegations describe individuals, subject to a well-defined chain of command and close supervision, performing services on behalf of a professional organization providing vital emergency services to the community. Based on the allegations of the complaint, the plaintiffs were not free to establish the terms of their relationship with the organization and were not simply volunteering their time gratuitously. The high degree of control the defendants exercise is indicative of an employment relationship. Indeed, both the Seventh Circuit and the Supreme Court have identified the question of control to be central to the existence of an employment relationship. *See, e.g., Glackamas,* 538 U.S. at 448 ("At common law the relevant factors defining the master-servant relationship focus on the master's control over the servant."); *Sidley Austin,* 315 F.3d at 705 ("the employer's right to control the worker's work" can be "the most important factor" in assessing status an employee); Restatement (Third) of Agency § 7.07(3)(a) (2006) (defining "employee" for purposes of *respondeat superior* as "an agent whose principal controls or has the right to control the manner and means of the agent's performance of work").

District courts are required to construe Title VII broadly to prevent and remediate discrimination in the workplace. *Smith v. Castaways Family Diner*, 453 F.3d 971, 985-856 (7th Cir. 2006); *Veprinsky v. Fluor Daniel, Inc.*, 87 F.3d 881, 889 (7th Cir. 1996). The Seventh Circuit has been explicit both that the definition of "employee" in Title VII be construed consistent with the statute's purpose, *Sidley Austin,* 315 F.3d at 704, and that "employee" should be given a "generous construction." *Veprinsky*, 87 F.3d at 889 (citing *Unger v. Consolidated Foods Corp.*, 657 F.2d 909, 915, n.9 (7th Cir.1981), vacated on other grounds, 456 U.S. 1002 (1982)); *see also Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 80-81 (1982) ("Through Title VII Congress sought in the broadest terms to prohibit and remedy discrimination."). A workplace is not necessarily any different for a non-compensated volunteer than it is for a compensated "employee," and while both are generally free to quit if they don't like the conditions (at-will employment being the norm), neither should have to quit to avoid sexual, racial, or other unlawful discrimination and harassment.

It is clear that remuneration is an important factor in defining an employment relationship. But the Supreme Court's instruction to evaluate the question using the common-law principles of agency, and its inclusion of considerations that do not pertain to remuneration on its non-exhaustive list of relevant factors, confirms that it is not the exclusive consideration. Consistent with that instruction, this Court does not draw any bright line requiring an "employee" to be salaried or that she receive substantial pecuniary remuneration. The question is whether the plaintiffs have alleged facts sufficient to make a plausible claim that they meet the requirements for Title VII protection, and in light of the totality of the plaintiffs' allegations, the Court concludes that they have. Accordingly, the Court denies the motion to dismiss the Title VII claims.

For the same reasons, the Court also denies the motion to dismiss the claims under the IHRA. The state statute, like Title VII, provides remedies for only employees against their "employers." Under the state statute, the defendants plainly are employers; the statute defines "employer" to include "any party to a public contract." 775 ILCS 5/2-101(B)(1)(d). The defendants point out, however, that unlike Title VII, the IHRA defines "employee" to require the performance of services "for remuneration," *see* 775 ILCS 5/2-101(A)(1), but the plaintiffs have alleged that they received some remuneration, in the form of training and uniforms, for their services. As discussed above, these benefits hardly rise to the level of "substantial" remuneration, but the Illinois statute does not require either "pecuniary" or "substantial" remuneration. Nor is the Court aware of (and defendants have not identified) any precedent from the Illinois courts interpreting the statute to include such qualifications. The Illinois courts consider "common law factors" in determining who is an "employee." *Mitchell v. Dep't of Corrs.*, 856 N.E.2d 593, 598 (Ill. App. Ct. 2006) ("We look both to the element of remuneration, as referred to in the Act, and to the common-law factors for determining whether a worker is an employee."). The most important of these factors is "control of the manner in which work is done." *Id.* And Illinois courts have stated that in deciding claims under the IHRA, specifically in the context of who is an "employee," they "look to the standards applicable to analogous federal claims." *Id.*; *Wanless v. Illinois Human Rights Com'n*, 695 N.E.2d 501, 503 (Ill. App. Ct. 1998). Anyway, the parties have not argued or cited authority to the effect that a person can be an "employee" for purposes of Title VII but not the IHRA. Therefore, the Court denies the motion to dismiss the IHRA discrimination, harassment, and retaliation claims against the defendants.

### C. Timeliness and exhaustion

Metro argues that the Title VII and IHRA claims also must be dismissed because "plaintiffs fail to establish that the claims are timely." Of course, plaintiffs need not "establish" anything in a complaint; "[c]omplaints need not do more than narrate a plausible claim for relief." *Morrison v. YTB Int'l., Inc*., 649 F.3d 533, 539 (7th Cir. 2011) (citing *Twombly*, 550 U.S. 544, and *Iqbal*, 556 U.S. 662). Moreover, a plaintiff is not required to plead compliance with a statute of limitations; untimeliness is an affirmative defense that can be resolved on a motion to dismiss only where it is clear from the face of the pleadings that the claim is "indisputably time barred." *See Small v. Chao*, 398 F.3d 894, 898 (7th Cir. 2005). Metro cites no allegations in the complaint that definitively show untimeliness, so its argument fails.

Similarly, the Court rejects Metro's argument that the IHRA claims must be dismissed because the plaintiffs "failed to exhaust their administrative remedies." Nothing in the complaint itself clearly shows that the plaintiffs failed to exhaust, and as with timeliness, the plaintiffs are not required to plead exhaustion in their complaint. *Mosely v. Bd. of Educ. of City of Chicago*, 434 F.3d 527, 532-33 (7th Cir. 2006). A plaintiff need not anticipate, and plead facts to negate, an affirmative defense. *Id*.

### D. Preemption of State-Law Tort Claims

The plaintiffs allege that the Defendants negligently retained and supervised individuals who they knew or should have known were "forcing Plaintiffs to endure extremely offensive and harmful conduct of a sexual nature and . . . were mistreating patients and otherwise endangering the public safety." These claims thus incorporated both the allegations of sexual discrimination and harassment on which the plaintiffs Title VII claims are premised, but also the complaint's allegations that a number of the defendants' supervisors were unfit to serve as emergency

medical personnel because, among other things, they physically abused and disparaged patients, delivered substandard care, worked and drove the ambulance while intoxicated, and falsified reports. Both defendants argue that these tort claims are preempted by the IHRA, and Metro adds that the Illinois Workers' Compensation Act ("IWCA") also preempts those claims.[8]

As to the IHRA, the defendants contend that it is the exclusive state remedy for sexual harassment, discrimination, and retaliation, which, they say, are all that the complaint alleges. The plaintiffs argue, on the other hand, that their complaint presents independent allegations to support the negligence claims. That much is required by Illinois law; IHRA preempts tort claims to the extent that the tort does not require proof of more than what is proscribed by the Act. *See* 775 ILCS 5/8-111; *Geise v. Phoenix Co. of Chicago, Inc*., 639 N.E.2d 1273, 1278 (Ill. 1994). Said otherwise, the Act preempts torts that are "inextricably linked" to civil rights violations. *Maksimovic v. Tsogalis*, 687 N.E.2d 21, 22 (Ill. 1997). Preemption "depends upon whether the tort claim is inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the Act itself." *Id*. at 23.

To the extent that the negligent retention and supervision counts are premised on the conduct that underlies the Title VII claims, plainly they are preempted. But, as the plaintiffs argue, these counts also target conduct "mistreating patients and otherwise endangering the

---

[8] The defendants also argue that these claims are duplicative because Illinois does not recognize distinct tort claims for negligent retention and negligent supervision. *See* Metro Memorandum, Dkt. # 37 at 15 (citing *Swift v. BPI Energy, Inc.*, 2011 WL 4001359 (C.D. Ill. Sep. 7, 2011); *Lawrence v. East Cent. Illinois Area Agency on Aging*, 2011 WL 1100506 (C.D. Ill. Feb. 22, 2011); ARS Memorandum, Dkt. # 39 at 14 (citing *Helfers-Beitz v. Degelman*, 939 N.E.2d 1087, 1091 (Ill. App. Ct. 2010); *Zahl v. Krupa*, 927 N.E.2d 262, 283 (Ill. App. Act. 2010). Plaintiffs cite *Soranno v. New York Life Ins. Co.,* 1999 WL 104403, *14 (N.D. Ill. Feb. 24, 1999), which relies on *Van Horne v. Muller,* 691 N.E.2d 74, 79 (Ill. App. Ct. 1998), for the proposition that "negligent and/or reckless hiring, supervision, and retention are distinct causes of action." The Court need not address the contradictory pronouncements on this issue, as the Court is dismissing these claims. However, even assuming the claims are duplicative, that would require dismissal of only one, not *both*.

public safety." Plaintiffs supply all manner of allegations about negligent, unsafe, and even life-threatening conduct of defendants' employees. The Complaint describes appalling acts such as fellow EMTs, supervisors, and ARS board members, treating patients while intoxicated, driving an ambulance while text messaging or while intoxicated, physically and verbally abusing patients, and "purposefully farting on the face of an unconscious patient." *See* Am. Cmplt., Dkt. 34 ¶ 42. There is no question that these actions are distinct from the allegations of offensive sexual remarks and conduct that support the sexual harassment and discrimination claims. So the defendants are largely off the mark in arguing preemption due to any similarity between the tort claims and the civil rights claims. For that reason, cases such as *Coleman v. Joliet Junior Coll.*, 2006 WL 3524417 (N.D. Ill. 2006), are not as "strikingly similar" to this one as Metro argues. Memorandum, Dkt. # 37 at 12.

Metro recognizes the more fundamental problem with this aspect of the plaintiffs' tort claims, however. To the extent the plaintiffs allege facts apart from those that support their discrimination and harassment claims, these plaintiffs lack Article III standing to bring negligence claims based on those facts. Although these allegations undoubtedly describe "misconduct in its own right," as required to avoid preemption, there is no allegation that these plaintiffs were injured apart from the public at large. This raises questions about both the existence of an injury-in-fact and its traceability to the acts that are alleged.

Moreover, the problem is not just one of standing. To even state a negligence claim, plaintiffs must allege some injury, *to someone*, caused by the breach of a duty. *Curtis v. Cook Cnty*, 456 N.E.2d 116, 118 (Ill. 1983) ("In order to adequately state a cause of action for negligence, the allegations must establish the existence of a duty of care owed by the defendant to the plaintiffs, a breach of that duty, and an injury proximately resulting from that breach.").

Damages are an essential element of any tort claim, and here the plaintiffs do not describe any injury or damages suffered by anyone—either themselves, or the patients, or members of the public—as a result of the non-harassing negligent conduct. No matter how egregious the conduct, there is no claim unless *someone* was harmed by it, and even if the conduct caused harm, the plaintiffs have no tort claim unless it harmed *them*.

The complaint alleges no harm to the plaintiffs flowing from the alleged mistreatment of patients and other conduct endangering public safety, and the plaintiffs did not respond to Metro's argument that standing is lacking for the state-law torts. This is, perhaps, understandable, as the plaintiffs had to respond to a slew of arguments raised in the 46 combined pages of the two defendants' opening briefs, and Metro's argument, which cites no legal authority, is a conclusory three sentences buried in its preemption argument. Memorandum, Dkt. # 37 at 14. But the problems are evident on the face of the Complaint, and the Court can examine constitutional standing *sua sponte,* and even dismiss claims on that basis. *Metallgesellschaft AG v. Sumitomo Corp. of Am.*, 325 F.3d 836, 842 (7th Cir. 2003) (noting that "a district court may dismiss a case *sua sponte* for lack of Article III standing if it finds that the plaintiff has not suffered injury-in-fact"). Therefore, the state-law negligence claims are dismissed without prejudice. If the plaintiffs can allege sufficient facts to plausibly suggest that they were injured by the non-harassing conduct, they may amend their complaint to do so.[9]

_____

[9] Metro's additional, cursory, argument that the IWCA also preempts the tort claims fails. The IWCA makes workers' compensation the exclusive remedy for "for accidental injuries sustained by any employee arising out of and in the course of the employment according to the provisions of this Act." 820 ILCS 305/11 (emphasis added). As an initial matter, the Court notes that Metro's preemption argument is not presented in the alternative, raising the question of whether it concedes the issue of the plaintiffs' status as employees, but in light of Metro's brief on that specific question, the Court does not construe its IWCA argument to concede that status. And since the Court has held that the plaintiffs have plausibly alleged that they are employees under IHRA, the IWCA preemption argument does not fail for that reason. Rather, as the foregoing

### E. Supplemental Jurisdiction

Having concluded that the plaintiffs have stated federal claims for relief, the Court need not address both defendants' arguments that it should employ its discretion to decline supplemental jurisdiction over the state-law claims.

\* \* \*

For the reasons set forth above, the Court GRANTS the motions to dismiss as to Counts I, II, VII, VIII, XIII, and IV (the § 1983 claims) and XIX, XX, XXI, and XXII (the negligence claims) and DENIES them as to all other claims in the Second Amended Complaint. The dismissal is without prejudice as to the state-law tort claims and with prejudice as to the § 1983 claims.

Entered: December 4, 2012

_____
John J. Tharp, Jr.
United States District Judge

---

discussion notes, it fails because the complaint alleges no injuries to the plaintiffs arising from accidental conduct. Injuries arising from the sexual discrimination and harassment were not accidental and the complaint alleges no injuries from the distinct allegations of patient mistreatment and public safety endangerment. Moreover, Metro fails to consider at all whether such injuries were accidental, whether they were compensable under the IWCA, or any other basis for avoiding preemption. *See Meerbrey v .Marshall Field & Co*., 564 N.E.2d 1222, 1225 (Ill. 1990); *Thomas v. Habitat Co*., 213 F. Supp. 2d 887, 892 (N.D. Ill. 2002).